TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0426-OA

IN RE: JOSEPH "JS" FLYNN, PULASKI CIRCUIT COURT CLERK

## OPINION AND ORDER

This is an original action to consider whether Joseph "JS" Flynn should be removed as Pulaski Circuit Court Clerk. After careful consideration and review of the entirety of the three-day hearing before the Special Commissioner, we find removal warranted and thus remove Flynn as Pulaski Circuit Court Clerk and declare that office vacant.

## FACTUAL AND PROCEDURAL POSTURE

Joseph "JS" Flynn was appointed Pulaski Circuit Court Clerk in 2016 and elected to that office in 2018. One circuit clerk is elected by the citizens in each Kentucky county, and his or her position involves the important responsibility of managing the court records, scheduling juries, and receiving court fines and costs for the Court of Justice. In many counties, this also entails hiring deputy clerks to assist with these duties. Tabitha Burnett was hired as a full-time deputy clerk in the Pulaski Circuit Court Clerk's office in 2018, a position she held until voluntarily leaving in February 2023.

On March 23, 2022, Burnett filed a complaint against Flynn with the Administrative Office of the Courts ("AOC") alleging several incidents in which Flynn engaged in inappropriate workplace behavior. While Flynn contested

many of Burnett's allegations, by his own admission he engaged in a brief sexual relationship with Burnett, his subordinate, in late 2021. Flynn acknowledges he did not report this relationship and the resulting conflict of interest as required. Flynn also does not dispute that he physically poked some of his employees in the office on work time to tease or scare them. He further acknowledges yelling and cursing at office staff in front of the public in March of 2022.

There were other allegations brought against Flynn both by Burnett and a co-worker and deputy clerk, Ashley Haste. Other than the admitted conduct outlined above, Burnett also alleged that two to three years prior, she went to lunch with Flynn and another co-worker Hanna Garner. Burnett further alleged that while riding back from the lunch in Garner's car, Flynn pulled Burnett from the front seat into the back seat of the vehicle, forcefully kissed her on the face and neck, pulled up her shirt and kissed her breast, and exposed himself, all while Garner and Burnett screamed for him to stop. Flynn denies the incident occurred, pointing out that he has two fourteen-inch surgically inserted rods in his back he contends would make it physically impossible for him to engage in the conduct described by Burnett.

Burnett further alleged in her complaint to AOC that for years, Flynn would rub her back, hair, and legs in the office. Burnett also alleged that in one incident, Flynn put his hand up her dress in front of her co-worker Haste and a bailiff, Junior Fortenberry. Haste has served as an administrative

2

support specialist for the Pulaski District Court for fourteen years. Flynn denies this incident occurred.

Finally, Burnett also alleged that the day before she filed her complaint, Flynn pushed her out of an office, slammed the door in her face, slammed the door in Haste's face, and then proceeded to curse and yell in Haste's face, causing a customer to cry. Burnett stated she was afraid to go to work because she felt threatened and was verbally and sexually harassed by Flynn.

On March 23, 2022, Haste also filed a complaint against Flynn with AOC. In her complaint, Haste largely repeated Burnett's allegation regarding Flynn screaming and cursing at Haste in front of office staff and the public. Flynn acknowledges that he yelled and cursed at Haste and that such conduct was unprofessional. Flynn asserts his conduct was in reaction to Burnett and Haste repeatedly interrupting an important meeting, Haste telling him that he was always in a meeting, and Haste accidentally bumping him in the face with the door.

This Court placed Flynn on paid investigative leave while AOC investigated the complaints. On June 24, 2022, the AOC Director provided both the Chief Justice and the Circuit Court Clerks Conduct Commission (the "Commission") with a report concluding based upon AOC's investigation that Flynn had engaged in unlawful workplace harassment and retaliation and had

3

created a hostile work environment. On September 19, 2022, the Commission referred the allegations against Flynn to this Court for further proceedings.[1]

By Order entered September 26, 2022, this Court instituted removal proceedings against Flynn. We referred the matter to a Special Commissioner to hold an evidentiary hearing, develop a full factual record, and make findings of fact and recommendations. Upon our invitation and request, the Attorney General served as Special Advocate to represent the interests of the Commonwealth in those proceedings. We ordered that Flynn be allowed to confront and cross-examine witnesses, to present evidence on his behalf, and to be represented by counsel at all stages.

The Special Commissioner held a three-day evidentiary hearing beginning on May 10, 2023. The Special Commissioner assigned the burden of proof to the Special Advocate to show by clear and convincing evidence that Flynn's removal from office is warranted. Both the Special Advocate and Flynn presented numerous witnesses and documentary evidence during the course of the evidentiary hearing, the record and proceedings of which we have reviewed in full.

On July 7, 2023, the Special Commissioner filed her Findings of Fact, Conclusions of Law, and Recommendations with this Court. The Special Commissioner concluded that Flynn created a hostile work environment by

---

[1] The Commission has authority to recommend disciplinary actions and remedial measures for circuit court clerks to the Chief Justice. Administrative Procedures of the Court of Justice, Part XVI, § 6. However, the Commission does not have authority to impose such actions or measures itself.

4

physically assaulting Burnett in the vehicle incident, reaching under her dress in the workplace, otherwise flirting with and touching her in the office against her wishes, and making sexual comments to her. The Special Commissioner found that Flynn also created a hostile work environment by pinching other female employees on the back below their bra while making statements such as "let daddy feel your bacon" and asking them to call him "daddy." Flynn acknowledges pinching employees to "scare" them but denies making reference to "bacon."

The Special Commissioner further found that Flynn engaged in acts of quid pro quo harassment because although Flynn and Burnett had a brief sexual relationship, Flynn's conduct toward Burnett changed markedly after she told him she was uninterested in a relationship. More particularly, the Special Commissioner found that Flynn became angry with Burnett, gave her the "cold shoulder," assigned supervision of her to a chief deputy clerk to avoid contact with her, and referred to her in numerous derogatory terms in front of employees and courthouse personnel.

The Special Commissioner also found that Flynn violated his duty to act with courtesy and respect when he screamed at Haste in front of office staff and the public and more generally by his periodic outbursts of anger when employees would make mistakes. Finally, the Special Commissioner concluded Flynn violated policy when he failed to report the conflict of interest that arose from the relationship he formed with his subordinate employee Burnett.

5

Flynn and the Special Advocate have now filed briefs with this Court. Following careful review of the briefs, the entirety of the three-day evidentiary hearing conducted by the Special Commissioner, and the record, we conclude Flynn's removal from the office of the Pulaski Circuit Court Clerk is warranted.

## ANALYSIS

### I. Proceedings For Removal of A Circuit Court Clerk.

The Kentucky Constitution vests authority for removal of a circuit court clerk with this Court: "The clerks of the Circuit Court shall be removable from office by the Supreme Court upon good cause shown." Ky. Const. § 114(3). When duty requires us to consider exercising this authority, we proceed in an original action in which we serve as the ultimate finder of fact and adjudicator. *See In re Overstreet*, 851 S.W.2d 458, 459 (Ky. 1993). Our practice is to appoint a Special Commissioner to conduct any evidentiary hearings required for resolution of an original action for removal of a circuit court clerk. *See id.* Additionally, our practice is to appoint a Special Advocate to represent the interests of the Commonwealth in such proceedings. In this case, we appointed retired Judge Jean Chenault Logue to serve as Special Commissioner, and the Attorney General's office to serve as Special Advocate.

Before Commissioner Logue, Flynn and the Special Advocate disputed who should bear the burden of proof. Flynn asserted the burden was on the Special Advocate to show good cause for his removal, while the Special Advocate asserted the burden was on Flynn to show good cause why he should

6

*not* be removed. Commissioner Logue concluded the Special Advocate bears the burden of proof to show good cause for Flynn's removal. We agree.

The language of the Kentucky Constitution is plain: we may remove a circuit court clerk for "good cause shown." Though this phrasing is passive and thus does not specify *who* must show good cause, the circuit court clerk would of course have no interest in showing good cause for his removal. Rather, the only logical reading of the provision is that the party seeking removal, *e.g.,* the Special Advocate, bears the burden of showing good cause for the clerk's removal. Moreover, this allocation of the burden of proof to the party seeking removal of an elected official properly recognizes the gravity of such proceedings. Requiring the Special Advocate to show good cause is also consistent with the rules applicable to civil actions more generally. *See* CR[2] 43.01(2) ("The burden of proof in the whole action lies on the party who would be defeated if no evidence were given on either side.").

As such, in original actions to consider removal of a circuit court clerk pursuant to Section 114 of the Kentucky Constitution, the burden of proof is on the Special Advocate to show good cause for removal of the clerk. That is, the Special Advocate must show "a legal cause which affects the ability and fitness" of the clerk "to perform the duties of the office." *Nicholson v. Jud. Ret. & Removal Comm'n*, 562 S.W.2d 306, 308 (Ky. 1978). The circuit court clerk of course must also be afforded an opportunity to rebut such a showing once it is made. *See Overstreet*, 851 S.W.2d at 460 (finding removal of circuit court

---

[2] Rule of Civil Procedure.

clerk warranted where clerk had "not provided a reasonable explanation" for deficiencies in discharging the duties of his office).

In the proceedings before Commissioner Logue, the parties also disputed the evidentiary standard applicable to circuit court clerk removal proceedings. Flynn argued that good cause for removal must be shown by clear and convincing evidence, while the Special Advocate asserted the evidentiary standard is a preponderance of the evidence (assuming the Special Advocate bears any burden at all). Commissioner Logue concluded the Special Advocate must show good cause for removal by clear and convincing evidence, and again we agree.

A useful analogy is found in proceedings for removal of a sitting judge. In such cases, our Supreme Court Rules specifically dictate that "proof shall be by clear and convincing evidence." SCR[3] 4.160. As we have explained, this higher evidentiary standard serves as a "safeguard[] . . . built in to protect a judge's rights." *Gentry v. Jud. Conduct Comm'n*, 612 S.W.3d 832, 841 (Ky. 2020). We see no reason to apply a lower evidentiary standard in proceedings for removal of a circuit court clerk. Circuit court clerks, like judges, are elected by the people to serve in public office. Actions for removal of such officials are matters of significant gravity requiring serious and careful consideration of whether removal of the elected official is required. As such, we conclude a higher evidentiary standard is warranted, and thus the Special Advocate must show good cause for removal of a circuit court clerk by clear and convincing

---

[3] Supreme Court Rule.

evidence. Of course, "[c]lear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people[.]" *Id.* at 846 (quoting *Commonwealth, Cabinet for Health & Fam. Servs. V. T.N.H.*, 302 S.W.3d 658, 663 (Ky. 2010)).

In their briefing to this Court, the parties also dispute what deference we should afford to the Special Commissioner's findings of fact, conclusions of law, and recommendations. Flynn urges that we should conduct a *de novo* review, while the Special Advocate contends we should defer to the factual findings of the Special Commissioner and afford her determinations "great weight."

As noted above, consideration of removal of a circuit court clerk proceeds in this Court as an original action. Ky. Const. § 114 ("The clerks of the Circuit Court shall be removable from office *by the Supreme Court* upon good cause shown.") (emphasis added). In such matters, we thus do not exercise appellate jurisdiction, but rather original jurisdiction in which we serve as the ultimate finder of fact and adjudicator in determining whether good cause is shown for removal of the circuit court clerk. We name the Special Commissioner to receive evidence and render recommendations on behalf of the Court. However, because we serve as the final finder of fact and adjudicator (and not in an appellate capacity), we do not defer to the findings of fact, conclusions of

9

law, or recommendations of the Special Commissioner. In other words, our review is entirely *de novo*.[4]

In sum, proceedings to consider removal of a circuit court clerk proceed in this Court as an original action. In such proceedings, the Special Advocate bears the burden to show by clear and convincing evidence that good cause exists for removal of the clerk. The circuit court clerk must be afforded an opportunity to rebut such a showing. We review the findings of fact, conclusions of law, and recommendations of a Special Commissioner in a circuit court clerk removal proceeding *de novo*.

## II. Flynn's Due Process Rights Were Not Violated In The Course Of These Proceedings.

Having described the general contours of an original action for removal of a circuit court clerk, we turn now to Flynn's contention that he was denied due process during the proceedings before the Special Commissioner. We are not persuaded that Flynn has been denied due process.

First, Flynn contends an order prohibiting him from speaking with AOC employees denied him due process. However, that order was lifted and did not prevent Flynn from investigating the claims against him. Second, Flynn

---

[4] An apt analogy is found in the office of a master commissioner, whose reports a court may adopt, modify, or reject in whole or in part, or remand with further instruction. *See* CR 53.05(2). A court may also receive further evidence on a matter following a master commissioner's report. *Id.* "In sum, the trial court has the broadest possible discretion with respect to the use it makes of reports of . . . commissioners[,]" including "to re-evaluate the evidence and reach a different conclusion than the commissioner." *Eiland v. Ferrell*, 937 S.W.2d 713, 716 (Ky. 1997). So too with our consideration of a Special Commissioner's findings of fact, conclusions of law, and recommendations in an original action to consider removal of a circuit court clerk.

10

complains that AOC employees were represented by an attorney. Again, the mere fact that AOC employees were represented by counsel did not in any way inhibit Flynn's investigation or preparation of a defense. He had the ability to confront and cross-examine witnesses, to present evidence on his behalf, and was represented by counsel at all stages.

Third, Flynn asserts he was denied due process by virtue of an order prohibiting him from contacting AOC employees unless they agreed in writing to be contacted. After a thorough review of the various protective orders issued during the course of these proceedings—some of which were necessitated by Flynn's appearance outside the Pulaski County Courthouse in a manner that some employees found unnerving—we can find no such prohibition. At most, the record includes an order that allowed AOC employees to state their wish *not* to be contacted, but we find no order prohibiting Flynn's counsel from contacting employees without written authorization. Moreover, even had such an order been entered, it would not have been inappropriate given Flynn's conduct outside the Pulaski County Courthouse during the course of these proceedings.

Finally, Flynn complains that actions by the Special Clerk appointed to serve in his absence violated his due process rights. More particularly, Flynn contends the Special Clerk made a number of unflattering statements about Flynn and his counsel to employees of the Pulaski Circuit Court Clerk's office— many of whom were potential witnesses in the case. According to Flynn, the Special Clerk told the employees in large meetings that they should not speak

11

with Flynn's counsel because his attorneys were not "on their side," that Flynn was enjoying a huge vacation and living the dream by being on paid administrative leave, and that Flynn was unethical. Allegedly, the Special Clerk also instructed employees on methods to avoid service of subpoenas from Flynn's counsel.

However, we have already considered and rejected Flynn's argument that this conduct rises to the level of a due process violation. Indeed, Flynn moved to dismiss this case when he learned of the Special Clerk's conduct. We concluded that the conduct could be "appropriately addressed through examination of witnesses at the evidentiary hearing" and that the "issues raised may affect the weight and credibility of the witness testimony but do not support dismissal of this action." Nothing in the post-hearing briefing leads us to a different conclusion, and thus we again do not find the conduct complained of to rise to a due process violation. As such, we find no due process violations in the proceedings conducted by the Special Commissioner.

### III. Good Cause Exists to Remove Flynn from Office.

We now turn to the merits of whether Flynn should be removed as Pulaski Circuit Court Clerk. After careful consideration, and with due regard for the gravity attendant to proceedings for removal of an elected official, we conclude Flynn's removal as Pulaski Circuit Court Clerk is warranted.

### A. Flynn Created a Hostile Work Environment.

This Court has promulgated by administrative order a Circuit Court Clerk Code of Conduct binding on each of the Commonwealth's circuit court

12

clerks.  Supreme Court Order 2014-12 ("Circuit Court Clerk Code").  This Code requires that circuit court clerks comply with, among other things, the Workplace Policies set forth in Part III of the Court of Justice's Administrative Procedures ("Workplace Policies").  *Id.* §§ 1-2.

The Workplace Policies in turn mandate a "work environment free of unlawful harassment or retaliation based on" a number of protected bases, including sex.  Workplace Policies § 3.03(1)(a).  Thus, the Workplace Policies prohibit "unlawful workplace harassment," defined to include "unwelcome or unsolicited speech or conduct based upon . . . sex . . . that creates a hostile work environment."  *Id.* § 3.03(2)(a).  The determination of whether a work environment is hostile requires consideration of

> all of the circumstances including, but not limited to: (1) the frequency of the alleged harassing conduct; (2) the severity of the alleged harassing conduct; (3) whether the alleged harassing conduct was physically threatening or humiliating; and (4) whether the alleged harassing conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, or offensive environment.

*Id.* § 3.03(2)(b).

A circuit court clerk's creation of a hostile work environment violates the Workplace Policies and the Circuit Court Clerk Code, and thus constitutes "a legal cause which affects the ability and fitness" of the clerk "to perform the duties of the office."  *Nicholson,* 562 S.W.2d at 308.  That is, creation of a hostile work environment is "good cause" for removal of circuit court clerk.  *See id.*  Here, we find by clear and convincing evidence that Flynn created a hostile work environment by 1) sexually assaulting Burnett in Garner's vehicle,

13

2) placing his hand up Burnett's dress in the workplace, 3) engaging in unwanted touching of and flirtation with Burnett, 4) physically touching other co-workers, asking them to call him "daddy," and referring to parts of their bodies as "bacon," and 5) intimidating female staff, including by screaming and cursing at his employees in front of other staff and the public and by referring to female staff and customers in derogatory and sexualized ways.

First, we find the testimony outlining the events that occurred during the incident in Garner's vehicle highly credible. Burnett unequivocally testified that Flynn pulled her from the front seat to the back seat, kissed her, lifted her shirt, kissed her chest, and exposed himself, all against her will. While Flynn testified the events alleged by Burnett were physically impossible given the rods in his back, Burnett explained she did not physically resist Flynn pulling her and was not wearing a seatbelt. In her testimony, Garner corroborated Burnett's testimony that Flynn pulled Burnett into the back seat, that both women had to scream before Flynn stopped, and that Flynn apologized when he exited the vehicle. In addition, two other employees testified Burnett told them about the incident immediately after it occurred, while a third testified she told him about it later. And while Burnett waited a significant amount of time to report the incident, she explained she delayed for fear of losing her job because she had seen Flynn fire another employee who had filed a complaint against him. Finally, while Flynn presented a number of witnesses who testified that Burnett generally could be manipulative or dishonest, we do not find that testimony—even crediting it as true—to significantly undermine the

14

credibility of Burnett regarding the particular allegations in this case.  As such, and in considering the entirety of the record, we find by clear and convincing evidence that the incident in Garner's vehicle occurred as reported by Burnett.

Flynn's blatant sexual assault of Burnett alone is sufficient grounds for his removal, given its physical, threatening, offensive, intimidating, and severe nature.  But unfortunately, it was not an isolated incident.  Similar in severity was Flynn's placing of his hand up Burnett's dress in the workplace, which was not only reported in testimony by Burnett but also by two additional employee eyewitnesses who observed the conduct themselves.  Further troubling is Flynn's unwanted physical touching of Burnett's back, hair, and legs, which another eyewitness testified to observing as being uncomfortable for Burnett.  Given the frequency and severity of the sexual and physical assaults endured by Burnett, we conclude without question that Flynn created a hostile work environment as to her.

In addition, Flynn's conduct created a hostile work environment not only as to Burnett, but also as to numerous other female employees in the office.  Those employees testified that Flynn engaged in repeated unwanted physical touching of female employees, referred to himself and asked others to refer to him as "daddy," made crude sexual comments regarding women's body parts and his own sex life, and referred to women's body parts as "bacon."  Moreover, the photographic evidence introduced at the evidentiary hearing further suggests Flynn permitted, if not encouraged, an inappropriately sexualized workplace.  Indeed, photographs of one office costume party depict Flynn

15

surrounded by female employees wearing fishnet stockings, knee-high leather boots, tops with plunging necklines, and extremely short dresses—one apparently part of a cheerleader costume with "PLAYBOY" written in large letters on the front. Finally, Flynn's inappropriate conduct also extended to intimidation of his female staff by screaming, cursing, and derogatory and sexualized comments that subjected them to humiliation not only in front of their fellow co-workers but also the public more generally.

In sum, the overwhelming weight of the testimony and evidence presented at the hearing establishes by clear and convincing evidence that Flynn created a hostile work environment. Certainly, Flynn's sexual assault of Burnett in Garner's vehicle satisfies that standard. Moreover, in considering the entirety of Flynn's conduct as whole, it is plain he frequently engaged in severe and physically humiliating sexual harassment of Burnett and other female employees that unreasonably interfered with the functioning of the workplace and created an intimidating, hostile, and offensive environment. On this basis alone we would find the admittedly severe sanction of Flynn's removal from office warranted.

## B. Flynn Engaged In Quid Pro Quo Harassment.

We also find by clear and convincing evidence that Flynn engaged in quid pro quo harassment. The Workplace Policies prohibit such harassment, defined as

> unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct when submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, or submission to or rejection of such

16

> conduct by an individual is used as the basis for an employment decision affecting the individual.

Workplace Policies § 3.03(2)(c). Here, the testimony established that Flynn and Burnett both briefly pursued at least a sexual relationship that Burnett terminated after approximately two weeks. The testimony further established that after Burnett ended the relationship, Flynn refused to supervise her and instead assigned a Chief Deputy Clerk to perform that role. In other words, Flynn engaged in quid pro quo harassment by making an employment decision affecting Burnett after she ended their relationship.

The clear and convincing evidence further established that Flynn also engaged in a number of other forms of harassment against Burnett after she ended the relationship that materially changed the conditions of her employment. Burnett testified Flynn refused to speak to her, was angry with her, gave her the "cold shoulder," and referred to her by numerous derogatory terms, including "ho," "badge bunny," and someone needing to go to the health department for STD[5] treatment. At least one other employee also testified to overhearing Flynn call Burnett a "bitch." As such, we also conclude that Flynn engaged in quid pro quo harassment by making employment decisions and negatively affecting Burnett's conditions of employment after she ended their relationship, all in violation of the Workplace Policies.

---

[5] Sexually Transmitted Disease.

17

**C. Flynn Failed to Perform His Duties With Courtesy And Respect.**

The Circuit Court Clerk Code also requires clerks to perform their duties "[w]ith courtesy and respect for the public, litigants, lawyers, subordinate employees, and all others with whom the clerk interacts as a part of his or her official duties[.]" Circuit Court Clerk Code § 4(2)(a). Failure to do so may result in disciplinary action and/or remedial measures. *Id.* § 8(1).

Flynn violated the mandate to perform his duties with courtesy and respect when he physically pursued Haste while yelling and cursing at her, all in front of his staff and members of the public. Flynn acknowledges the incident occurred, and we conclude it was unquestionably a blatant violation of his obligation to perform his duties with courtesy and respect. His failure to do so reflected poorly not only on himself, but also unfortunately on the judiciary he was elected to serve. While perhaps insufficient alone to warrant the severe sanction of removal, when considered together with Flynn's other conduct at issue in this case it nonetheless further supports our conclusion that removal is required.

In sum, after reviewing the entirety of the three-day evidentiary hearing conducted by Commissioner Logue and the record as whole, we find by clear and convincing evidence that Flynn created a hostile work environment by sexually assaulting Burnett in Garner's vehicle, placing his hand up Burnett's dress in the office, and engaging in unwanted touching of and flirtation with Burnett. We also find that Flynn created a hostile work environment as to other female employees by engaging in frequent and offensive unwanted

18

physical touching, asking them to call him "daddy," and referring to parts of their bodies as "bacon." We further find that Flynn also engaged in quid pro quo harassment by changing Burnett's supervisor and referring to her in numerous derogatory ways after she ended their relationship. Finally, we also conclude Flynn violated his obligation to perform his duties with courtesy and respect when he chased, yelled, and cursed at Haste in front of his staff and members of the public.

While we acknowledge the gravity of removal of an elected official from office, and the severity of such a sanction, we nonetheless find removal warranted here. As such, we hereby remove Flynn from the office of the Pulaski Circuit Court Clerk for the remainder of his term. The Office of the Pulaski Circuit Court Clerk is declared vacant. Flynn must pay the costs of these proceedings.

VanMeter, C.J.; Bisig, Conley, Keller, Nickell, and Thompson, JJ., sitting. VanMeter, C.J.; Bisig, Conley, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only. Lambert, J., not sitting.

ENTERED: March 14, 2024

_____
CHIEF JUSTICE VANMETER

19

COUNSEL FOR SPECIAL ADVOCATE:

Russell M. Coleman
Attorney General of Kentucky

Aaron J. Silletto
Assistant Attorney General

Marc Manley
Assistant Attorney General


COUNSEL FOR RESPONDENT:

Joseph E. Lambert
Lambert & Lambert, PLLC

Jason M. Nemes
Commonwealth Counsel Group, PLLC


SPECIAL COMMISSIONER:

Judge Jean Chenault Logue (Ret.)